Donald W. Lojek, ISB No. 1395
LOJEK LAW OFFICES
1199 W. Main St.
P.O. Box 1712
Boise, Idaho 83701
Telephone:    (208) 343-7733
Facsimile:    (208) 343-5200

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALAN DIRK SCOTT and DENA SCOTT, husband and wife, | CASE NO. _____ |
| Plaintiffs, | |
| vs. | VERIFIED COMPLAINT |
| UNITED STATES OF AMERICA AND ITS AGENCY, THE DEPARTMENT OF VETERANS AFFAIRS, | Filing Fee: $350.00 |
| Defendants. | |

COME NOW the Plaintiffs above named and for their complaint against the United States of America and its agency, the Department of Veterans Affairs, allege as follows:

1.     Plaintiff, Alan Dirk Scott, is a veteran having served in the armed forces of the United States during the Vietnam war.  As a veteran he is entitled to certain medical services provided by the Department of Veterans Affairs.

2.     Plaintiff, Dena Scott, is the spouse of Alan Dirk Scott.  They are and were husband and wife at all material times hereto.

VERIFIED COMPLAINT - 1
Complaint.wpd/wc

3.    The Department of Veterans Affairs is an agency of the United States. This action is brought pursuant to 28 USC §§ 2674, et seq. and this Court has jurisdiction pursuant to 28 USC § 1346(b)(1).

4.    Beginning in the summer of 2000 Alan Dirk Scott was under the care of the Boise Veterans Administration Medical Center (hereinafter VAMC Boise).

5.    Thereafter and over the following approximately four years Mr. Scott was seen by numerous physicians at the VAMC Boise and was prescribed drugs and medication which were dispersed by the pharmacy at VAMC Boise.

6.    Over these years Mr. Scott was at first mis-diagnosed as "bipolar with depression" and later mis-diagnosed at various times as "bipolar disorder with psychotic features" and "bipolar disorder with psychosis".

7.    Over this same course of time Mr. Scott was over-medicated, improperly medicated, not advised properly regarding the medications he was taking and not provided with adequate and appropriate therapeutic testing and monitoring regarding the medications he had been prescribed by employees of the defendant.

8.    The course of conduct by the VAMC Boise and its employees, including those physicians who treated Mr. Scott, diagnosed Mr. Scott's problems and the pharmacy which filled the prescriptions for Mr. Scott, was negligent and below the standard of care for like health care providers.

9.    As a proximate result of this negligence and failure to meet applicable standards of care both Mr. Scott and his spouse, Dena Scott, were severely damaged.

VERIFIED COMPLAINT - 2
Complaint.wpd/wc

10.    Mr. Scott's conjugal and other marital relationships with his spouse were diminished to the point of non-existence. He became childlike, needed constant assistance and supervision and was in a constant state of confusion.

11.    As a proximate result of the negligence of the VAMC Boise Mr. Scott became unable to work and lost his job which paid approximately $85,000.00 annually.

12.    Mr. Scott has suffered and will continue to suffer an annual loss of income and earning capacity of at least $61,000.00 per year to age 65 beginning in October, 2006.

13.    In addition to the economic loss, Mr. Scott also suffered organic damage as evidenced by hypotension, CAD, prinz metals angina, QTc interval elongations, ST depression, T-wave inversion, ischemia and left ventricle problems as a proximate result of the negligence of the defendant's employees.

14.    During the time of Mr. Scott's impairment which has, to some degree, abated at this point in time, Mrs. Scott became an almost full-time caretaker. She suffered from worry, concern, fright, mental anguish and loss of intimate and normal marital relations with her husband.

15.    Tort claims were filed by the plaintiffs with the VA Regional Counsel in Boise on behalf of both Mr. and Mrs. Scott on or about September 12, 2006. This was shortly after they discovered the negligence of the United States and its employees and causal connections.

16.     In spite of numerous inquiries and encouragement to please complete an investigation on the tort claims of Mr. and Mrs. Scott the defendant, at this point in time, has taken no action and has neither accepted nor denied these tort claims although more than six months has passed since the filing of plaintiffs' tort claims.

17.     Accordingly, this action is brought under the Federal Tort Claims Act, 28 USC §§ 2674, et seq.  The damages claimed are as noted in the Notices of Tort Claims which are appended to this complaint and incorporated herein by reference.

WHEREFORE, plaintiffs pray as follows:

1.     For an award of their special and compensatory damages as may be proved at trial but not less than those amounts previously claimed.

2.     For the costs, expenses and attorneys' fees reasonably incurred in this action.

3.     For pre-judgment interest on all amounts awarded herein.

4.     For such and other further relief as the court deems just.

DATED this _3rd_ day of April, 2008.

LOJEK LAW OFFICES, CHTD.

By:_____
Donald W. Lojek - Of the Firm
Attorneys for Plaintiffs

VERIFIED COMPLAINT - 4
Complaint.wpd/wc

## VERIFICATION

ALAN DIRK SCOTT, being first duly sworn on his oath, deposes and states:

That he is a Plaintiff in the above-entitled action, that he has read the foregoing Verified Complaint and that the statements contained therein are true to the best of his knowledge and belief.

_____
Alan Dirk Scott

STATE OF IDAHO )
                         ) ss
County of Ada        )

On this _3rd_ day of April, 2008, before me, the undersigned notary public in and for said state, personally appeared **Alan Dirk Scott**, known or identified to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
NOTARY PUBLIC FOR IDAHO
Residing at: _Boise_
My Commission Expires: _6-2-12_

VERIFIED COMPLAINT - 5
Complaint.wpd/wc

DENA SCOTT, being first duly sworn on her oath, deposes and states:

That she is a Plaintiff in the above-entitled action, that she has read the foregoing Verified Complaint and that the statements contained therein are true to the best of her knowledge and belief.

_____
Dena Scott

STATE OF IDAHO )
                  ) ss
County of Ada    )

On this 3rd day of April, 2008, before me, the undersigned notary public in and for said state, personally appeared **Dena Scott**, known or identified to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
NOTARY PUBLIC FOR IDAHO
Residing at: _Boise_
My Commission Expires: _6-2-12_

VERIFIED COMPLAINT - 6
Complaint.wpd/wc

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency:<br><br>Veterans Administration<br>Office of Regional Counsel<br>805 W. Franklin<br>Boise, ID 83702 | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, Street, City, State and Zip Code)<br>Alan Dirk Scott                    Lojek Law Offices, Chtd.<br>7936 Tommy Lane                 PO Box 1712<br>Nampa, ID 83686                  Boise, ID 83701 |
|---|---|

| 3. TYPE OF EMPLOYMENT<br>□ MILITARY  ☒ CIVILIAN | 4. DATE OF BIRTH<br>08/26/52 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>August, 2000 and following | 7. TIME (A.M. OR P.M.)<br>Unknown |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Please see attached documents explaining the basis of the claim.

RECEIVED

SEP 12 2006

V A
REGIONAL COUNSEL
Boise

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code):
There is a loss of income of at least $ 875,000.00 included in paragraph 12b.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

N/A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

See attached document entitled: Basis of Tort Claim of Alan Dirk Scott

| 11. | WITNESSES |
|---|---|

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Dena Scott | 7936 Tommy Lane, Nampa, Idaho  83686 |
| VAMC Boise Physicians and Staff as stated in enclosed document. | 500 W. Fort St., Boise, Idaho  83702 |

| 12. (See instructions on reverse.) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE<br>Loss of income included in 12b | 12b. PERSONAL INJURY<br>$2,000,000.00 | 12c. WRONGFUL DEATH<br>N/A | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.)<br>$2,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.)<br>*[signature]* | 13b. Phone number of person signing form<br>(208) 467-4606 | 14. DATE OF SIGNATURE<br>9/12/06 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

| 95-109 | NSN 7540-00-634-4046 | STANDARD FORM 95<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2 |
|---|---|---|

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance?   ☐ Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.    ☒ No

| 16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes   ☒ No | 17. If deductible, state amount.  N/A |
|---|---|

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim?  (It is necessary that you ascertain these facts.)
No

19. Do you carry public liability and property damage insurance?   ☐ Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).    ☒ No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a)  In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b)  In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c)  In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d)  Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. Authority: The requested information is solicited pursuant to one or more of the following:  5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. Principal Purpose: The information requested is to be used in evaluating claims.
C. Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. Effect of Failure to Respond: Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C.  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

SF 95   BACK

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT

Beginning in the summer of 2000, the claimant, Alan Dirk Scott, was under the care of the Boise Veteran's Administration Medical Center (hereinafter VAMC Boise).  He was seen by Dr. T. Jolene Starr on August 2, 2000, diagnosed with a major depression and given prescriptions for Wellbutrin, Amitriptyline and Klonopin.  An appointment was arranged with Dr. Kenneth G. Khatain.

Over the following four years Mr. Scott was seen by numerous physicians at the VAMC Boise.  Among them were the previously mentioned Drs. Starr and Khatain. Additionally, the following physicians and health care providers saw Mr. Scott: Sharon Brewer, PA; E. Gregory Thompson, MD; Trent I. Lengl, PA; Anne T. Palsma, MD; Mary Hammons, RN; Mary Curtis, RN; Inger Olson, RN; Judith Area, RN; Stephen Zeimontz, RN; Rex Lott, PharmD; Mukesh Mittal, MD; Ossalina J. Coulter, RN; Lisa Eugleman, NP; Mary Hammons, RN; Margaret Jorgensen, RN; Larry Dewey, MD; Maryann Hardesty, RN; Elzada Stepp, RN; Shannon Hayes; Kattie Blackburn, MD Peggy Lynne, RN; Kathleen Kelley, RN; Alan H, Hines, MD; Joann Leone, MD; Vilma Medina, RN; Dr. David A. Hindson; and Keri J. Farnam, MSW.  This may not be a complete list, but, through September 13, 2004, it is reasonably accurate.

During these same four years, Mr. Scott was at first mis-diagnosed as "bipolar with depression" and later mis-diagnosed at various times as "bipolar disorder with psychotic features" and "bipolar order with psychosis."

During these same four years, Mr. Scott was prescribed an amazing array of medications.  Among them were:

1. Risperidone
2. Lithium Carbonate
3. Propranolol
4. Loperamide
5. Dival Proex
6. Dicyclomine
7. Citalopram
8. Clonazepam
9. Lansoprazole
10. Depakote
11. Klonopin
12. Wellbutrin
13. Alprazolam
14. Seroquel
15. Xanax
16. Risperdal
17. Benadryl
18. Zyprexa
19. Valproic Acid
20. Inderal
21. Benzonatate
22. Thiamine
23. Celexa
24. Carbamazepine

Lithium levels and other types of blood analysis to determine therapeutic medication levels were not conducted appropriately during this time. Dr. Kenneth G. Khatain was the primary physician and health care provider during this time span. On August 25, 2004 Mr. Scott had no noted cognitive deficits.

On September 13, 2004, Mr. Scott was seen by Dr. Khatain and prescribed two new medications: Geodon and Topamax. Topamax was to be titrated to 100 mg bid. The Geodon was to be titrated to 80 mg bid or less. Dr. Khatain's instructions regarding the starting dosages of these two medications do not appear in the progress note of September 13, 2004. However, the following medications were ordered to be continued *in addition to* the Geodon and Topamax: Benztropine; Carbamazepine; Citalopram; Clonazepam; Lithium Carbonate; Nitroglycerin; Propranolol; and Risperidone; Depakote

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 2

and Valproic Acid.[1] Geodon and Topamax are indicated for schizophrenia patients. Mr. Scott was never diagnosed as schizophrenic.

Both the Topamax and Geodon were given to Mr. Scott on September 13, 2004 by the VAMC Boise Pharmacy. The Geodon (Ziprasidone) container of 60 - 80 mg capsules stated "Take One Capsule by Mouth Twice a Day". There were no instructions regarding titration which the manufacturer recommends to begin at 25 mg bid.

Similarly, the Topamax given to Mr. Scott at the VAMC Boise Pharmacy on September 13, 2004 was, according to the manufacturer, to be titrated at 50 mg/day and over 8 weeks to be increased gradually to 200 mg bid. Instead, the Topamax container given to Mr. Scott stated:    100 mg twice daily. Prescriptions of these two psychotropic drugs to be commenced at the same time was contraindicated.

Adequate blood review following the commencement of the Geodon and Topamax regimen was not conducted by VAMC Boise. Additionally FDA warnings on Topamax indicate Topamax should not be administered to persons taking Valproic Acid. Mr. Scott was taking Valproic Acid as prescribed by VAMC Boise when he was given the additional medication Topamax. Geodon should not be prescribed with another medication that widens QTc intervals. Topamax widens QTc intervals. Topamax is also not to be prescribed to patients taking Depakote. Mr Scott was taking Depakote at this time.

Unsurprisingly, an over-medicated and mis-diagnosed Mr. Scott reported to the VAMC Boise on September 29, 2004 with significant complaints but was not admitted and no blood samples were taken for analysis. He was advised to continue his medications.

---

[1] VA records indicate that Mr. Scott's Depakote and Valproic Acid were discontinued prior to September 13, 2004. These records are incorrect which is further reflective of the negligence of the VAMC Boise.

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 3

On October 8, 2004 a non-ambulatory Mr. Scott returned to the VAMC Boise with his wife and daughter with complaints of serious behavior problems including, but not limited to, confusion, somnolence, cognitive impairment, dizziness, reports of hallucinations, thoughts of self-harm, paranoia and memory impairment.  VAMC Boise records falsely or incorrectly report Mr. Scott taking 160 mg bid of Geodon.  He did not do so.  He did take 160 mg of Geodon per day -- 80 mg twice per day as prescribed.   Mr. Scott was then hospitalized at the VAMC Boise in serious condition.  An EKG noted a QTc prolongation of 484ms upon admission.  As of October 14, 2004, Mr. Scott was still being administered no less than 17 active inpatient medications as reflected in his medical records.

As a result of this course of treatment which can be accurately described as "polypharmacy" Mr. Scott and his family were sadly and severely impacted.  Mr. Scott lost his job with AmeriTitle which paid $85,000.00 annually as of April 13, 2004.  Prior, Mr. Scott worked with Pioneer Title at $130,000.00 per year.  He lost that job after working at Pioneer since 1979 in February of 2002.  His conjugal and other marital relationships with his wife of 22 years was diminished to the point of zero.  He became childlike, needed constant assistance and supervision and was in a constant state of confusion.  Appended to this document as Exhibit "A" and incorporated by reference is a statement from Mr. Scott's spouse, Dena Scott, which details the state to which Mr. Scott was reduced because of this treatment by the VAMC Boise physicians and staff.   Mr. Scott's cognitive impairment was documented by Dr. Craig Beaver, whose report is attached as Exhibit "B" to this document.  He will suffer an annual loss of income of at least $61,000.00 per year to age 65 beginning in October, 2006.

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 4

Beginning in 2006, Mr. Scott began seeing Scott P. Hoopes, MD, a board-certified psychiatrist and neurologist. Dr. Hoopes tapered and stopped the Depakote prescribed to Mr. Scott at the VAMC Boise as well as other medications. Since, Mr. Scott has improved in his cognitive functioning although he remains unemployed and heart-damaged. Dr. Hoopes notes that no serum ammonia studies were done by the VAMC Boise from October, 2000 onwards nor, for that matter, were adequate blood samples taken to monitor lithium levels. Dr. David A. Hindson, of the VAMC Boise noted on November 29, 2004 that "the lab tests of November 22, 2004 do point to lithium as the probable culprit causing stimulation of your parathyroid glands and resultant elevation of the level of calcium in your blood." Thus, Mr. Scott's hyperparathyroidism has been explained.

As a proximate result of the "polypharmacy" negligently practiced by the physicians and staff at the VAMC Boise, as well as the negligence of the pharmacy at VAMC Boise Mr. Scott suffered additional organic damage. VAMC Boise records document damage to Mr. Scott's heart to include hypotension, CAD, prinz metals angina, QTc interval elongations, ST depression, T-wave inversions, ischemia, and left ventricle problems. Dr. Hines believed that Mr. Scott was overmedicated further supporting Mr. Scott's claim of toxic polypharmacy.

Mr. Scott has been tested in 2006 by Dr. Martha Kline, a board-certified neurologist, at Dr. Beaver's request. She has ruled out any neurologic reasons for Mr. Scott's condition which can be traced to the polypharmacy.

The foregoing indicates that the standard of care required of the health care professionals who were responsible for the diagnosis and treatment of Mr. Scott's reported symptoms was repeatedly breached. The initial diagnosis of a bipolar condition was

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 5

incorrect and negligently made without due consideration. VA records incorrectly allege a diagnosis of a bipolar condition spanning some 17 years. This is incorrect. Mr. Scott was never diagnosed as bipolar until the year 2000 when he began his treatment at VAMC Boise. The treatment of this incorrect diagnosis by prescribing an ever-cascading series of drugs which each have a powerful effect on the central nervous system caused the VAMC Boise to begin treating the side-effects of drugs which were unnecessarily prescribed. To continue, year after year, to pile on medication upon medication without adequate testing and monitoring amounts to reckless misconduct supporting Mr. Scott's claim for both economic and non-economic damages. The negligence of the VAMC Boise employees is imputed to the United States and its agency, the Veterans Administration.

Economic damages are computed as follows:

$85,000.00 annual salary + $6,000.00 in benefits = $91,000.00

Two and ½ years @ $91,000.00 = $227,500.00

Eleven years to age 65 @ $61,0000.00 = $671,000.00

| Present lost income | $227,500.00 |
|---|---|
| Future lost income | $671,000.00 |
| Medications necessary for cardiac problems* | $ 19.800.00 |
| Total Economic Loss | $918,300.00 |

DATED this 12th day of September, 2006.

Alan Dirk Scott

*Dr. Hoopes has prescribed Felodopine @ $55.00/month and Atenalol @ $11.00/month which will assist cardiac problems for his lifetime.

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 6

Dear Sir:

The man I married 22 years ago was like he stepped out of the pages of GQ magazine. He was charming and debonair. Dirk was incredibly intelligent and witty. He was optimistic and outgoing. He was strong, yet sensitive. He was decisive and compassionate. I absolutely worshipped the ground he walked on.

He was a romantic and devoted husband, and even better father. We have 6 children of our own and raised eight foster children. We took two children at a time, who were teenagers and most had previous run-ins with the law. He was patient, extremely loving, and invested his non-working hours in our family. We fished, the boys hunted, we hiked, we skied cross-country and downhill, and played sports. We took cross-country bicycle tours with our kids and 50 other Youth for Christ adolescents for a week every year until our kids began driving.

He was a dedicated Christian. He chaired our church's benevolence committee and helped hundreds of people with groceries, jobs, house payments, and to locate resources. He was civically involved, which he did during his working hours. He volunteered and chaired committees for the Board of Realtors, Chamber of Commerce, Real Estate Research, and Christian Business Men's organizations. He was a sought after public speaker, and people loved to hear his views on real estate, investing, and banking. He loved people and they were drawn to him.

He was in control of a multi-million dollar corporation and very in command. His company led the industry in market share. He was always in first place. He was competitive. He was very innovative. Dirk developed new programs and ways to serve his customers. He set the trends in his industry. He was an expert on title law, and even judges called him for his opinion. He was THE expert in his field. And if he worked on a parcel, he'd remember the whole title chain. If he met someone, he knew their name and he was really attentive to the details of their lives. His employees adored him. He was North Idaho's Boss of the Year in 1997. His staff would willingly follow him anywhere. He invested in their lives, he cared about their struggles, and he would give them the shirt off his back if they needed it. He ran the company with attention to every detail and balanced millions in assets. He could find a lost nickel. He was amazing at multi-tasking. I'd walk into his office and he'd be talking on the phone, signing payroll checks, and giving instructions to his

# EXHIBIT A

assistant. He organized and coordinated major events with hundreds and thousands of people in attendance, and it would come off flawlessly. He was self-motivated and very driven. He was an extremely successful business executive.

**Now**

**He has Memory loss.** He forgets recently learned information, appointments, names or telephone numbers. And he can only occasionally remember them later. He no longer remembers the names of people he meets, or people he knows. He'll even scramble up the names of his own kids, and he just plain can't recall the grandkids' names. He has trouble recalling information or finding the right words. He asks the same questions repeatedly.

**Difficulty performing familiar tasks.** He finds it hard to complete everyday tasks that are so familiar we usually do not think about how to do them. He can't remember the steps for preparing a meal, how to use some household appliances (like the microwave, computer, or fax machine) or participating in a lifelong hobby. He was an expert skier and he can barely stand upright on a pair of skis. He doesn't remember the steps to fly fishing, or which flies work. He falls off his bicycle. He has forgotten how to read musical notes or play the trumpet. He doesn't remember a stove is on, or checks if the coffee is too hot to drink. He's put a pizza in the oven with the paper on it and started a fire. He forgets to eat, or what he has eaten. He has rototilled up our sprinkler heads. He has mowed the lawn with the blades disengaged, and tried to ride it up the ramp with the blades still moving. He assembled a small shelf with about 20 screws by hand because he forgot we have an electric driver. He leaves on lights (a former pet peeve of his), water (which if fun when he overfills an in ground pool), the telephone, and sprinklers. I have dozens of these instances. And forget trying to teach him something he didn't already know how to do. He just can't follow the directions- written or spoken. He has trouble learning new things or coping with unexpected situations and he has a shortened attention span. He has soiled the bed twice, and occasionally wets the bed. He has erectile dysfunction.

**Problems with language.** This area has been the most frustrating to convey to someone who didn't know him before. He was so articulate and had such a command of vocabulary that he was like a walking dictionary/encyclopedia. I'm educated and fairly intelligent, but I didn't even come close to his knowledge of words. His spelling

was incredible. So, in his last tests, he is in the normal range, if they don't look at processing speed. So that means, given lots of time, he has normal language usage. But it is a fraction of what he was. Even so, he still has trouble finding the right word sometimes, forgets simple words or substitutes unusual words. He does this more with idioms. Like, "two shakes of a lamb's tail," becomes "when two lamb's shake a tail." Or if he hears part of what you say, his guess at what you said makes absolutely no sense in context. One I remember was when our youngest daughter headed upstairs. She said, "I going to get dressed." He pieced together, "I'm changing my beliefs." Needless to say, communication, which was the best part of our relationship, has become cumbersome. He was an avid reader. He always woke up with a book and a cup of coffee. He can't remember, or frequently comprehend what he's read. He still has all his decoding skills, so he can sound out the words. He doesn't read as fast as he once did, but it's a reasonable rate. But he just doesn't retain what he's read. Occasionally he'll recall bits, but most often he doesn't remember reading it at all. He does the same thing with television programs. They are all new to him, no reruns. Consequently, he doesn't have much interest in TV or books, which makes filling his days more of a challenge. Plus, he has difficulty organizing thoughts. He'll try to write it down to make sense of it. I have saved many of these writings. They are crazy ramblings.

**Disorientation to time and place.** Dirk has difficulty in following directions, difficulty with spatial relations. Additionally, he forgets the day of the week, the month and the year, regularly. Sometimes, he doesn't know whether it is morning or afternoon. We bought a special watch that uses military time and displays the date or he'd never know whether it was morning, afternoon, and sometimes night. He can become lost in own neighborhood, forget where he is, and how he got there, and not know how to get back home. This one's tough, because it isn't all the time. He has good days and bad days. Consequently, he is still driving. He may drive too fast or too slow. He may not notice traffic signs, or gets angry or confused. When his thyroid was elevated due to the Lithium, I just wouldn't let him drive. He was a danger to himself and others. He was so disoriented that it wasn't safe. I have gotten calls from him that he is pulled over and doesn't know where he is or how to get home. I have gotten calls from him that he can't remember where he was headed. He's lost the car in the parking lot of a store numerous times. He's gotten lost in the store. This gets so much worse when I take him out of Nampa. We went to Texas to see my mother (a place he has been before, and even helped build an

addition on), and he regularly didn't even know where he was. We couldn't sight see because he was so disoriented. He spent two weeks in a chair on her porch, it was sad. When we travel to Post Falls to see our children, he can cope if we stay with our oldest daughter, because she lives in our old house, but he gets disoriented if he leaves there. He gets really restlessness, agitated, and anxious, sometimes tearful, or wanders, or paces, especially in the late afternoon or evening when he is anywhere but home.

**Poor or decreased judgment.** I took away his ATM card because he would withdraw money if he got near a machine (unfortunately he remembers our pin number), he'd carry around large amounts of cash, he'd give it away to the vets at the Vet Center, or forget where he put it. I'd find money in strange places in the car, in the house, in the garage. We pay our bills online. He'd paid some bills a penny, and other bills he'd way overpay (on a one-time expense) and I'd spend months getting it refunded. He'd order things on the Internet that he didn't want, didn't need, and didn't remembering ordering once they arrived. He has trouble with daily living skills. I group his clothing so that he can coordinate colors; he has worn two different shoes. He will dress without regard to the weather, wearing a sweatshirt and sweat pants to go out when it's 100 degrees or shorts when it's 50. He bought me 3 cashmere sweaters for $400 at Christmas, to wear at school where we get paint and glue on everything. He turned on the sprinkler system (which we had paid to have winterized) in December. He fertilized the yard twice in succession, and burned holes in it. He experiences hallucinations, delusions, suspiciousness, panic attacks, and paranoia. He has hunting knives hidden all over our house, outbuildings, and garage because he thinks someone or something is after him, at times. He's locked himself in our bedroom with a knife, because the government was coming for him. He's pulled over and hid at a rest station (and called me) because he's convinced someone is trying to shoot him in the back of the head on the highway. He's accused his family of hiding things from him, stealing, and trying to desert him.

**Problems with abstract thinking.** He struggles with calculations like basic addition and subtraction, (although he has an MBA and could perform calculus and trigonometry). He can't reconcile the bank statement (even though he used to balance million dollar escrow accounts). He's had instances where he forgot what goes in the blanks of the check, and had to have assistance. He struggles to coordinate and organize a project, or even a family event like a barbeque. He requires assistance to make travel arrangements, negotiate an airport,

check-in, and locate his gate (Although He used to travel the west coast to procure large national contracts).

**Changes in personality and overall vitality.** People's personalities ordinarily change somewhat with age, but he has changed a lot, becoming extremely confused, suspicious, fearful and dependent on a family. He has periods where he is very passive, sitting in front of the television for hours, sleeping late into the morning and not wanting to do usual activities like shaving and showering. At times he is irritable, anxious, or depressed. Dirk has sleep disturbances. His legs jerk and it feels to him like they are crawling with bugs. He may take hours to fall asleep. He becomes agitated (physical or verbal aggression, general emotional distress). He has Parkinson's like symptoms that make him tremor. His speech and movements are rigid and slow. He has extreme difficulty with balance. If he closes his eyes while standing he will wobble and fall. If he stands suddenly, he blacks out. During the day he becomes drowsy and nods off (it doesn't matter where you are at the time). His thinking is slow, and frequently his speech is slurred. He sees and hears things that aren't there. He is shell of his former self.

*I have talked to his doctors about these symptoms. I have asked for help in developing a rehabilitation plan. They listen, but it's like they don't hear me. One thing that is difficult for anybody who doesn't spend time with him is that he looked so good. He is a gorgeous man, and he looks better than what we would consider, "normal." I hear that all the time from my friends. "Well, he looks better." If he were in a wheelchair, or missing legs, I think it is easier to see the damage. But it's all on the inside. He can carry on a conversation, usually. Too bad he won't remember having it. I'm a special education teacher, and I spend my every moment of off time developing systems to help him live more independently, and teaching him strategies to cope with his disabilities. I have set up our home so that he is able to navigate it with his cognitive deficits. We have timers everywhere. He has a written schedule. His things are always in the same place, and labeled if necessary. There are reminder lists everywhere. The directions for working appliances are posted. I call to give him reminders. His phone is set up for autodial. I have passwords on everything related to our finances to prevent his misuse. When he goes to the doctor, there is a pre-made list of questions and responses. If he doesn't know, doesn't remember, or can't handle it- he calls or I attend. Our children assist with things where he can endanger himself like pruning, and burning slash piles, or using power tools. For months after the overdose he*

couldn't drive. We still drive when possible, and encourage him to limit driving. I helped him practice driving routes, over, and over, and over. He always takes the same route or he'll get lost. His medications are set up for him a week in advance for morning, noon, dinner, and night. His watch beeps when it's time for his next dose. The only medication he takes unattended is a vitamin. I sold his guns, and locked up or gave away the knives (although I keep finding more). I could go on and on. There has been improvement in his functioning, but not in his abilities. Our youngest daughter moved home to help care for him this past year. Our oldest daughter and son-in-law are putting their home on the market, moving 400 miles, to help care for Dirk. I guess what is the most disheartening of everything is that the VA has left us on our own to deal with their mistake. Our lives will never be the same. I can live with that. But it's the apathy that hurts. It's a lot like the war we fought in Vietnam, and in which Dirk served. They screwed it up and then walked away!

Very Truly Yours,


Dena Scott

COPY

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency:<br><br>Veterans Administration<br>Office of Regional Counsel<br>805 W. Franklin<br>Boise, ID 83702 | 2. Name, Address of claimant and claimant's personal representative, if any. (See Instructions on reverse.)  (Number, Street, City, State and Zip Code)<br>Dena Scott                     Lojek Law Offices, Chtd.<br>7936 Tommy Lane            PO Box 1712<br>Nampa, ID 83686             Boise, ID 83701 |
|---|---|

| 3. TYPE OF EMPLOYMENT<br>□ MILITARY  ☒CIVILIAN | 4. DATE OF BIRTH<br>12/8/59 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>August, 2000 and following | 7. TIME (A.M. OR P.M.)<br>Unknown |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Please see attached documents explaining the basis of the claim.

RECEIVED

SEP 12 2006

V A
REGIONAL COUNSEL
Boise

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).
N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

N/A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

See attached document entitled: Basis of Tort claim of Dena Scott

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) | |
| Alan Dirk Scott | 7936 Tommy Lane, Nampa, Idaho  83686 | |
| VAMC Boise Physicians and Staff as stated in enclosed document. | 500 W. Fort Street, Boise, Idaho  83702 | |

| 12. (See instructions on reverse.) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE<br>N/A | 12b. PERSONAL INJURY<br>$500,000.00 | 12c. WRONGFUL DEATH<br>N/A | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.)<br>$500,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of person signing form<br>(208) 467-4606 | 14. DATE OF SIGNATURE<br>9/12/06 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109                              NSN 7540-00-634-4046                              STANDARD FORM 95<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No

| 16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | ☐ Yes   ☒ No | 17. If deductible, state amount. <br> N/A |
|---|---|---|

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim?  (It is necessary that you ascertain these facts.)

No

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

SF 95          BACK

BASIS OF TORT CLAIM OF DENA SCOTT

My husband, Dena Scott, is filing a tort claim this date and has explained the basis of his claim in a document attached to his form SF95 entitled Basis of Tort Claim of Dirk Alan Scott. I incorporate that statement, as well as its attachments, into this document. Mr. Scott's statement is also attached to this document for ease of reference.

I have been married to Alan Dirk Scott for 23 years. Prior to his treatment at the VAMC Boise he had never been diagnosed as bipolar. He led an exemplary life as a good father to our six children and as a good husband and provider.

My claim is based on a loss of consortium under Idaho law. Because of the negligence of the physicians and staff at the VAMC Boise, my husband became completely dependent. I lost his love, affection, companionship, conjugal relations, guidance and help in our married life. I became his caretaker in every respect. He lost his job. We lost income. I believe the conduct of the health care providers at the VAMC Boise to have been not only negligent but reckless and responsibility for this conduct is imputed to the United States.

Again, I would direct the reader to my husband's statement attached to his SF95 which incorporates a more detailed statement from me. Out of an abundance of caution, I attach that statement to this document as Exhibit "A."

DATED this 12th day of September, 2006.

Dena Scott

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT

Beginning in the summer of 2000, the claimant, Alan Dirk Scott, was under the care of the Boise Veteran's Administration Medical Center (hereinafter VAMC Boise). He was seen by Dr. T. Jolene Starr on August 2, 2000, diagnosed with a major depression and given prescriptions for Wellbutrin, Amitriptyline and Klonopin. An appointment was arranged with Dr. Kenneth G. Khatain.

Over the following four years Mr. Scott was seen by numerous physicians at the VAMC Boise. Among them were the previously mentioned Drs. Starr and Khatain. Additionally, the following physicians and health care providers saw Mr. Scott: Sharon Brewer, PA; E. Gregory Thompson, MD; Trent I. Lengl, PA; Anne T. Palsma, MD; Mary Hammons, RN; Mary Curtis, RN; Inger Olson, RN; Judith Area, RN; Stephen Zeimontz, RN; Rex Lott, Pharm D; Mukesh Mittal, MD; Ossalina J. Coulter, RN; Lisa Eugleman, NP; Mary Hammons, RN; Margaret Jorgensen, RN; Larry Dewey, MD; Maryann Hardesty, RN; Elzada Stepp, RN; Shannon Hayes; Kattie Blackburn, MD Peggy Lynne, RN; Kathleen Kelley, RN; Alan H, Hines, MD; Joann Leone, MD; Vilma Medina, RN; Dr. David A. Hindson; and Keri J. Farnam, MSW. This may not be a complete list, but, through September 13, 2004, it is reasonably accurate.

During these same four years, Mr. Scott was at first mis-diagnosed as "bipolar with depression" and later mis-diagnosed at various times as "bipolar disorder with psychotic features" and "bipolar order with psychosis."

During these same four years, Mr. Scott was prescribed an amazing array of medications. Among them were:

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 1

1. Risperidone
2. Lithium Carbonate
3. Propranolol
4. Loperamide
5. Dival Proex
6. Dicyclomine
7. Citalopram
8. Clonazepam
9. Lansoprazole
10. Depakote
11. Klonopin
12. Wellbutrin
13. Alprazolam
14. Seroquel
15. Xanax
16. Risperdal
17. Benadryl
18. Zyprexa
19. Valproic Acid
20. Inderal
21. Benzonatate
22. Thiamine
23. Celexa
24. Carbamazepine

Lithium levels and other types of blood analysis to determine therapeutic medication levels were not conducted appropriately during this time.  Dr. Kenneth G. Khatain was the primary physician and health care provider during this time span.  On August 25, 2004 Mr. Scott had no noted cognitive deficits.

On September 13, 2004, Mr. Scott was seen by Dr. Khatain and prescribed two new medications:  Geodon and Topamax.  Topamax was to be titrated to 100 mg bid.  The Geodon was to be titrated to 80 mg bid or less.  Dr. Khatain's instructions regarding the starting dosages of these two medications do not appear in the progress note of September 13, 2004. However, the following medications were ordered to be continued *in addition to* the Geodon and Topamax: Benztropine; Carbamazepine; Citalopram; Clonazepam; Lithium Carbonate; Nitroglycerin; Propranolol; and Risperidone; Depakote

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 2

and Valproic Acid.[1] Geodon and Topamax are indicated for schizophrenia patients. Mr. Scott was never diagnosed as schizophrenic.

Both the Topamax and Geodon were given to Mr. Scott on September 13, 2004 by the VAMC Boise Pharmacy. The Geodon (Ziprasidone) container of 60 - 80 mg capsules stated "Take One Capsule by Mouth Twice a Day". There were no instructions regarding titration which the manufacturer recommends to begin at 25 mg bid.

Similarly, the Topamax given to Mr. Scott at the VAMC Boise Pharmacy on September 13, 2004 was, according to the manufacturer, to be titrated at 50 mg/day and over 8 weeks to be increased gradually to 200 mg bid. Instead, the Topamax container given to Mr. Scott stated:    100 mg twice daily. Prescriptions of these two psychotropic drugs to be commenced at the same time was contraindicated.

Adequate blood review following the commencement of the Geodon and Topamax regimen was not conducted by VAMC Boise.    Additionally FDA warnings on Topamax indicate Topamax should not be administered to persons taking Valproic Acid. Mr. Scott was taking Valproic Acid as prescribed by VAMC Boise when he was given the additional medication Topamax. Geodon should not be prescribed with another medication that widens QTc intervals. Topamax widens QTc intervals. Topamax is also not to be prescribed to patients taking Depakote. Mr Scott was taking Depakote at this time.

Unsurprisingly, an over-medicated and mis-diagnosed Mr. Scott reported to the VAMC Boise on September 29, 2004 with significant complaints but was not admitted and no blood samples were taken for analysis. He was advised to continue his medications.

---

[1] VA records indicate that Mr. Scott's Depakote and Valproic Acid were discontinued prior to September 13, 2004. These records are incorrect which is further reflective of the negligence of the VAMC Boise.

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 3

On October 8, 2004 a non-ambulatory Mr. Scott returned to the VAMC Boise with his wife and daughter with complaints of serious behavior problems including, but not limited to, confusion, somnolence, cognitive impairment, dizziness, reports of hallucinations, thoughts of self-harm, paranoia and memory impairment.   VAMC Boise records falsely or incorrectly report Mr. Scott taking 160 mg bid of Geodon.  He did not do so.  He did take 160 mg of Geodon per day -- 80 mg twice per day as prescribed.    Mr. Scott was then hospitalized at the VAMC Boise in serious condition.  An EKG noted a QTc prolongation of 484ms upon admission.  As of October 14, 2004, Mr. Scott was still being administered no less than 17 active inpatient medications as reflected in his medical records.

As a result of this course of treatment which can be accurately described as "polypharmacy" Mr. Scott and his family were sadly and severely impacted.  Mr. Scott lost his job with AmeriTitle which paid $85,000.00 annually as of April 13, 2004.  Prior, Mr. Scott worked with Pioneer Title at $130,000.00 per year.  He lost that job after working at Pioneer since 1979 in February of 2002.  His conjugal and other marital relationships with his wife of 22 years was diminished to the point of zero.  He became childlike, needed constant assistance and supervision and was in a constant state of confusion.  Appended to this document as Exhibit "A" and incorporated by reference is a statement from Mr. Scott's spouse, Dena Scott, which details the state to which Mr. Scott was reduced because of this treatment by the VAMC Boise physicians and staff.   Mr. Scott's cognitive impairment was documented by Dr. Craig Beaver, whose report is attached as Exhibit "B" to this document.  He will suffer an annual loss of income of at least $61,000.00 per year to age 65 beginning in October, 2006.

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 4

Beginning in 2006, Mr. Scott began seeing Scott P. Hoopes, MD, a board-certified psychiatrist and neurologist. Dr. Hoopes tapered and stopped the Depakote prescribed to Mr. Scott at the VAMC Boise as well as other medications. Since, Mr. Scott has improved in his cognitive functioning although he remains unemployed and heart-damaged. Dr. Hoopes notes that no serum ammonia studies were done by the VAMC Boise from October, 2000 onwards nor, for that matter, were adequate blood samples taken to monitor lithium levels. Dr. David A. Hindson, of the VAMC Boise noted on November 29, 2004 that "the lab tests of November 22, 2004 do point to lithium as the probable culprit causing stimulation of your parathyroid glands and resultant elevation of the level of calcium in your blood." Thus, Mr. Scott's hyperparathyroidism has been explained.

As a proximate result of the "polypharmacy" negligently practiced by the physicians and staff at the VAMC Boise, as well as the negligence of the pharmacy at VAMC Boise Mr. Scott suffered additional organic damage. VAMC Boise records document damage to Mr. Scott's heart to include hypotension, CAD, prinz metals angina, QTc interval elongations, ST depression, T-wave inversions, ischemia, and left ventricle problems. Dr. Hines believed that Mr. Scott was overmedicated further supporting Mr. Scott's claim of toxic polypharmacy.

Mr. Scott has been tested in 2006 by Dr. Martha Kline, a board-certified neurologist, at Dr. Beaver's request. She has ruled out any neurologic reasons for Mr. Scott's condition which can be traced to the polypharmacy.

The foregoing indicates that the standard of care required of the health care professionals who were responsible for the diagnosis and treatment of Mr. Scott's reported symptoms was repeatedly breached. The initial diagnosis of a bipolar condition was

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 5

incorrect and negligently made without due consideration. VA records incorrectly allege a diagnosis of a bipolar condition spanning some 17 years. This is incorrect. Mr. Scott was never diagnosed as bipolar until the year 2000 when he began his treatment at VAMC Boise. The treatment of this incorrect diagnosis by prescribing an ever-cascading series of drugs which each have a powerful effect on the central nervous system caused the VAMC Boise to begin treating the side-effects of drugs which were unnecessarily prescribed. To continue, year after year, to pile on medication upon medication without adequate testing and monitoring amounts to reckless misconduct supporting Mr. Scott's claim for both economic and non-economic damages. The negligence of the VAMC Boise employees is imputed to the United States and its agency, the Veterans Administration.

Economic damages are computed as follows:

$85,000.00 annual salary + $6,000.00 in benefits = $91,000.00

Two and ½ years @ $91,000.00 = $227,500.00

Eleven years to age 65 @ $61,0000.00 = $671,000.00

| | |
|---|---|
| Present lost income | $227,500.00 |
| Future lost income | $671,000.00 |
| Medications necessary for cardiac problems* | $ 19,800.00 |
| Total Economic Loss | $918,300.00 |

DATED this 12th day of September, 2006.

Alan Dirk Scott

*Dr. Hoopes has prescribed Felodopine @ $55.00/month and Atenalol @ $11.00/month which will assist cardiac problems for his lifetime.

BASIS OF TORT CLAIM OF ALAN DIRK SCOTT - 6

Dear Sir:

The man I married 22 years ago was like he stepped out of the pages of GQ magazine. He was charming and debonair. Dirk was incredibly intelligent and witty. He was optimistic and outgoing. He was strong, yet sensitive. He was decisive and compassionate. I absolutely worshipped the ground he walked on.

He was a romantic and devoted husband, and even better father. We have 6 children of our own and raised eight foster children. We took two children at a time, who were teenagers and most had previous run-ins with the law. He was patient, extremely loving, and invested his non-working hours in our family. We fished, the boys hunted, we hiked, we skied cross-country and downhill, and played sports. We took cross-country bicycle tours with our kids and 50 other Youth for Christ adolescents for a week every year until our kids began driving.

He was a dedicated Christian. He chaired our church's benevolence committee and helped hundreds of people with groceries, jobs, house payments, and to locate resources. He was civically involved, which he did during his working hours. He volunteered and chaired committees for the Board of Realtors, Chamber of Commerce, Real Estate Research, and Christian Business Men's organizations. He was a sought after public speaker, and people loved to hear his views on real estate, investing, and banking. He loved people and they were drawn to him.

He was in control of a multi-million dollar corporation and very in command. His company led the industry in market share. He was always in first place. He was competitive. He was very innovative. Dirk developed new programs and ways to serve his customers. He set the trends in his industry. He was an expert on title law, and even judges called him for his opinion. He was THE expert in his field. And if he worked on a parcel, he'd remember the whole title chain. If he met someone, he knew their name and he was really attentive to the details of their lives. His employees adored him. He was North Idaho's Boss of the Year in 1997. His staff would willingly follow him anywhere. He invested in their lives, he cared about their struggles, and he would give them the shirt off his back if they needed it. He ran the company with attention to every detail and balanced millions in assets. He could find a lost nickel. He was amazing at multi-tasking. I'd walk into his office and he'd be talking on the phone, signing payroll checks, and giving instructions to his



EXHIBIT A

was incredible. So, in his last tests, he is in the normal range, if they don't look at processing speed. So that means, given lots of time, he has normal language usage. But it is a fraction of what he was. Even so, he still has trouble finding the right word sometimes, forgets simple words or substitutes unusual words. He does this more with idioms. Like, "two shakes of a lamb's tail," becomes "when two lamb's shake a tail." Or if he hears part of what you say, his guess at what you said makes absolutely no sense in context. One I remember was when our youngest daughter headed upstairs. She said, "I going to get dressed." He pieced together, "I'm changing my beliefs." Needless to say, communication, which was the best part of our relationship, has become cumbersome. He was an avid reader. He always woke up with a book and a cup of coffee. He can't remember, or frequently comprehend what he's read. He still has all his decoding skills, so he can sound out the words. He doesn't read as fast as he once did, but it's a reasonable rate. But he just doesn't retain what he's read. Occasionally he'll recall bits, but most often he doesn't remember reading it at all. He does the same thing with television programs. They are all new to him, no reruns. Consequently, he doesn't have much interest in TV or books, which makes filling his days more of a challenge. Plus, he has difficulty organizing thoughts. He'll try to write it down to make sense of it. I have saved many of these writings. They are crazy ramblings.

**Disorientation to time and place.** Dirk has difficulty in following directions, difficulty with spatial relations. Additionally, he forgets the day of the week, the month and the year, regularly. Sometimes, he doesn't know whether it is morning or afternoon. We bought a special watch that uses military time and displays the date or he'd never know whether it was morning, afternoon, and sometimes night. He can become lost in own neighborhood, forget where he is, and how he got there, and not know how to get back home. This one's tough, because it isn't all the time. He has good days and bad days. Consequently, he is still driving. He may drive too fast or too slow. He may not notice traffic signs, or gets angry or confused. When his thyroid was elevated due to the Lithium, I just wouldn't let him drive. He was a danger to himself and others. He was so disoriented that it wasn't safe. I have gotten calls from him that he is pulled over and doesn't know where he is or how to get home. I have gotten calls from him that he can't remember where he was headed. He's lost the car in the parking lot of a store numerous times. He's gotten lost in the store. This gets so much worse when I take him out of Nampa. We went to Texas to see my mother (a place he has been before, and even helped build an

addition on), and he regularly didn't even know where he was. We couldn't see because he was so disoriented. He spent two weeks in a chair on her porch, it was sad. When we travel to Post Falls to see our children, he can cope if we stay with our oldest daughter, because she lives in our old house, but he gets disoriented if he leaves there. He gets really restlessness, agitated, and anxious, sometimes tearful, or wanders, or paces, especially in the late afternoon or evening when he is anywhere but home.

**Poor or decreased judgment.** I took away his ATM card because he would withdraw money if he got near a machine (unfortunately he remembers our pin number), he'd carry around large amounts of cash, he'd give it away to the vets at the Vet Center, or forget where he put it. I'd find money in strange places in the car, in the house, in the garage. We pay our bills online. He'd paid some bills a penny, and other bills he'd way overpay (on a one-time expense) and I'd spend months getting it refunded. He'd order things on the Internet that he didn't want, didn't need, and didn't remembering ordering once they arrived. He has trouble with daily living skills. I group his clothing so that he can coordinate colors; he has worn two different shoes. He will dress without regard to the weather, wearing a sweatshirt and sweat pants to go out when it's 100 degrees or shorts when it's 50. He bought me 3 cashmere sweaters for $400 at Christmas, to wear at school where we get paint and glue on everything. He turned on the sprinkler system (which we had paid to have winterized) in December. He fertilized the yard twice in succession, and burned holes in it. He experiences hallucinations, delusions, suspiciousness, panic attacks, and paranoia. He has hunting knives hidden all over our house, outbuildings, and garage because he thinks someone or something is after him, at times. He's locked himself in our bedroom with a knife, because the government was coming for him. He's pulled over and hid at a rest station (and called me) because he's convinced someone is trying to shoot him in the back of the head on the highway. He's accused his family of hiding things from him, stealing, and trying to desert him.

**Problems with abstract thinking.** He struggles with calculations like basic addition and subtraction, (although he has an MBA and could perform calculus and trigonometry). He can't reconcile the bank statement (even though he used to balance million dollar escrow accounts). He's had instances where he forgot what goes in the blanks of the check, and had to have assistance. He struggles to coordinate and organize a project, or even a family event like a barbeque. He requires assistance to make travel arrangements, negotiate an airport,

check-in, and locate his gate (Although He used to travel the west coast to procure large national contracts).

**Changes in personality and overall vitality.** People's personalities ordinarily change somewhat with age, but he has changed a lot, becoming extremely confused, suspicious, fearful and dependent on a family. He has periods where he is very passive, sitting in front of the television for hours, sleeping late into the morning and not wanting to do usual activities like shaving and showering. At times he is irritable, anxious, or depressed. Dirk has sleep disturbances. His legs jerk and it feels to him like they are crawling with bugs. He may take hours to fall asleep. He becomes agitated (physical or verbal aggression, general emotional distress). He has Parkinson's like symptoms that make him tremor. His speech and movements are rigid and slow. He has extreme difficulty with balance. If he closes his eyes while standing he will wobble and fall. If he stands suddenly, he blacks out. During the day he becomes drowsy and nods off (it doesn't matter where you are at the time). His thinking is slow, and frequently his speech is slurred. He sees and hears things that aren't there. He is shell of his former self.

*I have talked to his doctors about these symptoms. I have asked for help in developing a rehabilitation plan. They listen, but it's like they don't hear me. One thing that is difficult for anybody who doesn't spend time with him is that he looked so good. He is a gorgeous man, and he looks better than what we would consider, "normal." I hear that all the time from my friends. "Well, he looks better." If he were in a wheelchair, or missing legs, I think it is easier to see the damage. But it's all on the inside. He can carry on a conversation, usually. Too bad he won't remember having it. I'm a special education teacher, and I spend my every moment of off time developing systems to help him live more independently, and teaching him strategies to cope with his disabilities. I have set up our home so that he is able to navigate it with his cognitive deficits. We have timers everywhere. He has a written schedule. His things are always in the same place, and labeled if necessary. There are reminder lists everywhere. The directions for working appliances are posted. I call to give him reminders. His phone is set up for autodial. I have passwords on everything related to our finances to prevent his misuse. When he goes to the doctor, there is a pre-made list of questions and responses. If he doesn't know, doesn't remember, or can't handle it- he calls or I attend. Our children assist with things where he can endanger himself like pruning, and burning slash piles, or using power tools. For months after the overdose he*